# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ERIC B. RASMUSEN, as Executor
of the Estate of Benjamin A.
Rasmusen, Deceased; ERIC B.
RASMUSEN, as Administrator of
the Estate of Elizabeth G.
Rasmusen, Deceased; ERIC B.
RASMUSEN, as Father and Next
Friend of Benjamin W.
Rasmusen, a minor, and Amelia
Rasmusen, a minor,

            Plaintiffs,

        v.

JEREMY WHITE, ANTHONY SCHMITT,
NATIONAL RAILROAD PASSENGER
CORPORATION (AMTRAK), BNSF
RAILWAY COMPANY, and THE FIRST
NATIONAL BANK OF OTTAWA,
ILLINOIS, as Administrator of
the ESTATE OF MARILYN S.
RASMUSEN, Deceased,

            Defendants.

Case NO. 10 C 6171

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court is the Motion of Defendant/Cross-Defendant First National Bank of Ottawa, as Administrator of the Estate of Marilyn S. Rasmusen (hereinafter, the "Estate of Marilyn R.") for an order of Good Faith Finding regarding its settlement with Plaintiffs and the dismissal of Plaintiffs' claims and claims against it. Defendants/Cross-Plaintiffs National Railroad Passenger Corporation ("Amtrak") and BNSF Railway Company ("BNSF")

(collectively, the "Railroad Defendants") oppose the motion and seek an order compelling discovery regarding the assets of the Estate of Marilyn R.

For the reasons stated herein, the Motion for Good Faith Finding and Dismissal is granted and the Motion to Compel is denied.

## I.  BACKGROUND

On the fateful day of July 13, 2009, Marilyn Rasmusen was driving south on East 23rd Road near Route 34 in LaSalle County. Next to her in the passenger seat was her husband, Benjamin A. Rasmusen; in the back seat, their three grandchildren: Elizabeth G. Rasmusen, Benjamin W. Rasmusen and Amelia Rasmusen.  For whatever reason, Marilyn Rasmusen apparently did not see or hear Amtrak's California Zephyr approaching from the east on the train tracks running parallel to Route 34 at approximately 80 miles per hour.

The train and car collided, killing Marilyn, her husband Benjamin A. and their grandchild Elizabeth.  Benjamin W. and Amelia were injured.

There were no gates or lights at the crossing, just a "crossbuck" railroad sign and a yield sign to warn motorists of the tracks.  Pictures of the scene taken by BNSF employee Kyle James ("James") show no obvious visual impediments between the road and the tracks that would have interfered with sightlines.  At the time

of the accident, a BNSF freight train was parked to the west of East 23rd Road – the opposite direction from which the Zephyr approached.

A little more than a month after the accident, on August 27, 2009, Amtrak claims representative Darryl P. Butler ("Butler") telephoned Eric Rasmusen ("Rasmusen"), son of the deceased Marilyn and Benjamin A. Rasmusen and father of the three children involved in the crash, to inquire about whether he would be filing suit. Eric Rasmusen said the family had not made a decision.

On September 3, 2009, Eric Rasmusen filed a Petition for Probate of Will and for Letters Testamentary as executor of Marilyn Rasmusen's estate.

On October 1, 2009, Butler phoned Eric Rasmusen again; again Eric Rasmusen expressed no definitive intent to sue. The rest of the characterization of those two Butler/Rasmusen conversations is in dispute. Butler contends Rasmusen acknowledged that "any lawsuit would need to take into account his mother's own negligence . . . as well as the railroads' claim for property damage." Railroad Def.s' Opp'n., Ex. K, 1. Rasmusen contends Butler did not indicate the Railroad Defendants would be pressing any claim against his mother's estate. Both sides agree Eric Rasmusen did not notify the Railroad Defendants of the Estate of Marilyn R.'s probate proceedings. Notice of probate was published in an Ottawa newspaper in September and October 2009.

Eric Rasmusen filed suit in this court on September 21, 2010 on behalf of all car occupants except his mother.  As to her, Eric Rasmusen sued himself, as executor of her estate.  When the Railroad Defendants pointed out this was a conflict of interest, a replacement executor, The First National Bank of Ottawa, Illinois was named as executor of Marilyn R.'s estate and an Amended Complaint filed.  The Railroad Defendants cross-complained against her estate for damage to their train and equipment in the amount of $1.8 million.

The Estate of Marilyn R. has proposed a settlement of Plaintiffs' claims in the amount of $500,000 – the personal injury limit on Marilyn's automobile policy.  Of this amount, $10,000 was advanced to the Estate of Elizabeth G. Rasmusen and $8,473.75 was advanced for Benjamin A. Rasmusen's funeral expenses.  Of the remainder, half would go to the Estate of Elizabeth Rasmusen, a quarter would go to the Estate of Benjamin A. Rasmusen, and the remaining quarter would be split evenly between Benjamin W. and Amelia Rasmusen.

## II.  <u>LEGAL STANDARD</u>

Both parties agree the Illinois Joint Tortfeasor Contribution Act (740 ILL. COMP. STAT. 100, *et seq.*) governs this case.  Under the act, settling joint tortfeasors seeking discharge from contribution liability bear the initial burden of making a preliminary showing of good faith.  *Johnson v. United Airlines et al.*, 784 N.E.2d 812,

818 (Ill. 2003).  That showing is a relatively low hurdle:  showing the existence of a legally valid settlement agreement and disclosing its terms.  *Cellini v. Vill. of Gurnee*, 932 N.E.2d 1139, 1148 (Ill. App. Ct. 2010).

Once that preliminary showing is made, the burden moves to the non-settling parties to show bad faith by a preponderance of the evidence.  *Id.*  Under the Joint Tortfeasor Contribution Act, bad faith is not defined (740 ILL. COMP. STAT. 100/2), but good faith will not be found where the settling parties engaged in wrongful conduct, collusion or fraud. *Id.* (quoting *United*, 784 N.E.2d at 821).

A large disparity between the settlement amount and the total potential recovery, taken alone, is not a dispositive showing of bad faith.  *United*, 784 N.E.2d at 822-823 (finding a $1,000 settlement in a potentially multimillion dollar plane crash to be in good faith).

Instead, the good faith inquiry is a totality-of-the-circumstances inquiry subject to the Court's discretion. *Dubina v. Mesirow Realty Dev.*, 756 N.E.2d 836, 839-846 (Ill. 2001) (finding bad faith where settling defendants paid additional amounts to plaintiffs for assignment of their claims against non-settling party, thereby depriving non-settling party of setoff of the full amount settling parties were willing to pay).  *See also In re Guardianship of Babb*, 642 N.E.2d 1195 (finding bad faith where

settlement was contingent on plaintiff repaying some of the settlement if additional monies were recovered from non-settling parties).

## III.  ANALYSIS

The parties seem to agree that Plaintiffs have met their preliminary burden of good faith.  Consideration was certainly given to Plaintiffs and details of the settlement have been disclosed.  (The Railroad Defendants, in any event, do not ask for production of a full copy of the settlement).  Where the parties differ is whether the Railroad Defendants have shown bad faith by a preponderance of evidence.

Railroad Defendants say bad faith is evident in several ways. First, the amount ($500,000) is disproportionate to the current demand by Plaintiffs (approximately $4.5 million).  They contend this would defeat the purpose of the Joint Tortfeasor Contribution Act, which is to extract contribution amounts commensurate with fault.  The Railroad Defendants contend that, with no visual impediments between Marilyn Rasmusen and the train, she was solely at fault for the crash, and letting her estate out at $500,000 saddles it with the rest – an unfair proportion.

They also argue bad faith by contending Eric Rasmusen was statutorily bound to notify them of the probate proceedings so they could state their claims for property damage against Marilyn R.'s Estate before the assets were disbursed.  Instead, Eric Rasmusen

did not notify them, and waited to file suit until a year after probate, long after the six-month period for making a claim had passed. (Plaintiffs, after long arguing six months was the drop-dead date for making a claim (Pls.' Resp., Ex. 4, 2, ECF No. 51-4) now argue that, in fact, Railroad Defendants still had 10 months to make a claim after being sued (Pls.' Resp. 4, ECF No. 41) – but that is neither here nor there, as we shall see.)

Finally, the Railroad Defendants argue that Plaintiffs and the Estate of Marilyn R. conspired to deny them discovery as to the assets in the estate when Railroad Defendants requested it. When Railroad Defendants requested discovery materials from the estate, *Plaintiffs* responded with legal arguments as to why that was inappropriate when liability had not yet been determined, Railroad Defendants contend.

To begin, the Court addresses the Plaintiffs' alleged slight-of-hand with the probate proceedings. The Court makes no finding in regards to the alleged probate improprieties; it strikes the Court as a matter to be taken up in probate court (although the Court makes no ruling in this regard). Certainly though, without the benefit of any serious briefing by the parties on whether abstention by this Court is proper or mandatory because the probate proceedings remain open, the Court also declines to rule on whether the failure to notify the Railroad Defendants was proper, or whether the Railroad Defendants' failure to make a claim within six

months forecloses their counterclaim for $1.8 million in property damage.

Luckily, the Court does not need to rule on that matter in order to resolve the issue at hand.  While the probate question may be relevant to the Railroad Defendants' cross-claim and what they may or may not eventually recover on that, the question here is whether the proffered settlement by Defendant Estate of Marilyn R. for *contribution* to *Plaintiff's claims* is one reached in good faith.

Conceivably, there might be an issue of good faith if the Plaintiffs (as dually represented by the initial executor of Marilyn R.'s Estate, Eric Rasmusen) had quickly distributed tens of millions of dollars of the estate's assets before filing suit – leaving Marilyn R.'s Estate with nothing to offer, or a mere fraction of the initial amount available. (But not necessarily: The *United* case makes clear that good faith settlements need not be all that a party *can* pay.  That was never identified as an issue in any of the cases the parties cited, nor in any that the Court found.)

In any case, those are not the circumstances here. Plaintiffs' attorney, Timothy B. Cantlin, has stated as an officer of the court that the personal property of the Estate of Marilyn R. was "substantially less than $75,000," Pls.' Resp. 9, ECF No. 51. The attorney for the Estate of Marilyn R., Gary R. Eiten, has

likewise sworn that "Marilyn Rasmusen did not own any real estate." Cross-Def.'s Resp. 9, ECF No. 50. Instead, she had a life estate in her mother's house and land, which passed from Marilyn R.'s possession when she died. *Id.*

That means that what the Estate of Marilyn R. is offering in contribution is the vast majority of the estate, which are the limits of the automobile policy (as to the contribution claims). The limit of the policy also happens to be all that is left of the estate. The Estate is offering Plaintiffs the full personal-injury policy limit of $500,000, and in an initial interpleader motion not yet fully briefed, offers the full $100,000 property damage limit.

Plaintiffs complain that the $500,000 is but a fraction of the potential liability. That, however, as *United* shows, is largely irrelevant to good faith, particularly when it is the bulk of the estate and the totality of the remaining assets.

While there is a statutory policy favoring proportional payment based on fault, that is balanced by the other statutory policy favoring early settlement of claims. *See O'Connor v. Pinto Trucking Serv., Inc.*, 501 N.E.2d 263, 266 (Ill. App. Ct. 1986) ("Public policy favors peaceful and voluntary resolutions of claims through settlement agreements.")

Additionally, Plaintiffs make a credible argument that liability is not a foregone conclusion in this case, further indicating that the settlement amount may not be disproportionate.

The Zephyr was speeding, albeit by a small amount (81 miles per hour on an 80 mph track), shortly before impact. The presence of a standing train in the other direction, Plaintiffs claim, may have served as a distraction to Marilyn R. It is at least a plausible theory, and juries have decided cases in stranger ways. It is safe to say that the case is not a slam dunk, and the liability of the estate of Marilyn R. may end up being much less than $4.5 million. Liability here is, in fact, an unknown, and settlements are designed to insure against the unknown, and are favored by the statute. *See Pinto*, *supra*.

As to Railroad Defendants' assertions that Plaintiffs controlled both sides of the litigation that was certainly true before an independent administrator was named to oversee the Estate of Marilyn R. But after that point, the Estate of Marilyn R. was represented by separate legal counsel and Railroad Defendants have not shown any collusion beyond the fact that the two parties took similar positions on discovery issues. The positions appear to have been based in sound legal precedent that the amount of funds a party possesses is not relevant until liability is established, and the similarity of the parties' arguments does not amount to bad faith. Nor is Railroad Defendants' assertion regarding discovery (that Plaintiffs responded to a discovery request posed to the Estate) as nefarious as first made out to be. Railroad Defendants' letter of August 4, 2011 (Pls.' Resp., Ex. 5, ECF No. 51-5) makes

clear that Railroad Defendants were in contact with Plaintiffs'

counsel in addition to the Estate of Marilyn R. on those discovery

matters, and thus a response from Plaintiffs was not very

surprising.

In any event, counsel for the Estate of Marilyn R. and

Plaintiffs have now represented as officers of the court that there

was less than $75,000 in assets beyond the automobile policy

limits. That also makes Railroad Defendants' request for discovery

moot.

Finally, Railroad Defendants make one last quasi-argument,

citing a section of the Illinois Code of Civil Procedure (735 ILL.

COMP. STAT. 5/2-1117) before defeating their own argument. This

section of the Code took away joint and several liability for any

defendant found to be less than twenty-five percent at fault. It

instead makes such a defendant only severally liable for its

amount. Railroad Defendants suggest that to allow the Estate of

Marilyn R. out of contribution liability would keep them out as a

party to consider when a jury starts assigning proportionate

contribution fault, thus defeating, or making more difficult, the

accomplishment of § 2-1117's goals.

It's a good argument. But unfortunately, as Railroad

Defendants admit, the Illinois Supreme Court already considered it

and rejected it. *See Ready v. United/Goedeck Services, Inc.*, 905

N.E.2d 725, 725 ("We hold that section 2-1117 does not apply to

good-faith settling tortfeasors who have been dismissed from the lawsuit.")  This Court is not in a position to reverse the state Supreme Court on this issue.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, the Court finds that the settlement between the Estate of Marilyn R. and Plaintiffs was made in good faith and it grants the Estate's Motion to Dismiss the Estate from any further contribution responsibility toward Plaintiffs.  Of course, the Estate remains a Counter-Defendant to Railroad Defendants' Cross-Claims, at least until the issue regarding whether the probate court activities preclude such a claim is resolved.

The Motion for Asset Discovery by Railroad Defendants is denied as moot.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

**DATE:** 5/11/2012