IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ERIC B. RASMUSEN, as Executor of the Estate of Benjamin A. Rasmusen, Deceased; ERIC B. RASMUSEN, as Administrator of the Estate of Elizabeth G. Rasmusen, Deceased; ERIC B. RASMUSEN, as Father and Next Friend of Benjamin W. Rasmusen, a minor, and Amelia Rasmusen, a minor, | |
| Plaintiffs, | Case NO. 10 C 6171 |
| v. | Hon. Harry D. Leinenweber |
| JEREMY WHITE, ANTHONY SCHMITT, NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK), BNSF RAILWAY COMPANY, and THE FIRST NATIONAL BANK OF OTTAWA, ILLINOIS, as Administrator of the ESTATE OF MARILYN S. RASMUSEN, DECEASED, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Before the Court are (1) Defendants' Motion to Bar Certain Testimony of James Loumiet [ECF No. 58]; (2) Defendants' Motion to Bar the Testimony of Richard Beall [ECF No. 59]; and (3) Defendants' Motion for Summary Judgment [ECF No. 61]. For the reasons stated herein, the Motions are granted in part and denied in part.

# I.  BACKGROUND

This case arises out of a tragic collision between a car and a train.  The parties agree to the following facts, except where noted.  East 23rd Road is a two-lane road in Adams Township, LaSalle County, Illinois running in a north-south direction.  Two railroad tracks running in an east-west direction intersect East 23rd.  Traffic control devices at the road crossing include reflectorized crossbucks and a yield sign.  There was also a "Two Tracks" sign.  An advance warning sign was located approximately 500 feet north of the crossing along East 23rd Road.  The crossbucks, yield sign and advance warnings signs were all clearly visible to a southbound motorist.  The tracks running through the crossing are classified by the federal government as Class IV tracks, with an authorized speed limit of 80 mph.

On July 13, 2009, Marilyn Rasmusen ("Rasmusen") was driving her 2001 Toyota Camry in a southerly direction down East 23rd Road at approximately 30 mph.  Her husband, Benjamin, Sr., was in the passenger seat.  Three of their grandchildren, Elizabeth, Ben and Amelia were in the back seat.  Rasmusen was familiar with both East 23rd Road and the grade crossing, as she lived on that road.

At the same time, a train owned by Defendant Amtrak ("Amtrak") was traveling along Track No. 1 in a westerly direction.  The train was being operated by its engineer, Defendant Jeremy White ("White"), and Defendant Anthony Schmitt ("Schmitt"), the assistant conductor.

The train, consisting of two locomotives and nine rail cars, was 892 feet long, and the rail cars were slightly taller than 15 feet high. According to the train's event recorder data, it was moving at 81 mph.

Around the time the train reached the whistle post, which is 1,300 feet from the crossing, White saw the Rasmusen car traveling southbound on East 23rd. It was the first time he had ever seen a car on East 23rd approaching this crossing. White testified that he watched the car all the way until he lost sight of it one or two seconds before impact. To White, the car always appeared to be traveling at a speed at which it could stop and yield to the train. Schmitt testified that he first saw the car when the train was about 500 feet from the crossing. When the train was 300 feet from the crossing, he said a prayer for the car to stop before the reaching the crossing.

Rasmusen's car did not stop, though, or even slow down. Instead she drove straight into the crossing. A few seconds prior to impact with Rasmusen's car, White told Schmitt that he thought they were going to hit the car. Despite this, it is undisputed that neither White nor Schmitt attempted the brake or slow the train at any point prior to collision. Impact occurred at 2:59:12.09 p.m., according to the event recorder clock. It is unknown if Mrs. Rasmusen ever looked for a train.

The crash was fatal. Marilyn, her husband, and one of their three grandchildren were killed in the accident. The other two grandchildren sustained serious injuries. Adding to the tragedy is the fact that just four days before the accident, the Illinois Commerce Commission issued an order to install lights or stop signs at the intersection within the next thirty days. Defendant BNSF Railway Company ("BNSF") claims it was unaware of any order to install lights or stop signs at the crossing until the day after the accident.

Among other issues, the parties dispute the circumstances surrounding the conditions of the crossing and whether or not the train's horn blew. With respect to the horn, White testified that he sounded the horn in the standard grade crossing pattern of two longs, a short, and a long. The train's event recorder reflected that the horn began sounding when the train was 150 feet past the whistle post, or 1,166 feet from the crossing. It sounded in this pattern for 9.9 seconds until impact. At the time Defendants contend the horn began, Mrs. Rasmusen's car was approximately 431 feet from the crossing. During the time between the first horn sound and the second horn sound, the train would have been 6-7 seconds from the crossing and Rasmusen's car would have been 264-308 feet from the crossing.

In contrast to the testimony of White and the event recorder, Plaintiffs present the testimony of two third-party witnesses who

were in the vicinity of the accident but did not hear the train horn prior to impact. Both Michael Fox, who was on the roof of his barn approximately .8 miles from the accident, and Miguel Vazquez, Sr., who saw the accident from his car on U.S. Route 34, swore they did not hear the train's horn prior to the accident.

The parties also dispute the circumstances of the crossing at the time of the accident. The fields to the east and west side of East 23rd Road were planted with soybeans. These fields, however, did not obstruct Mrs. Rasmusen's view of an approaching train. There were also evergreen trees located 577, 1,006 and 1,117 feet east of the crossing. According to one of Plaintiffs' experts, these trees would have obstructed Mrs. Rasmusen's view of the train when she was 401 feet and 255 feet away from the crossing. Plaintiffs' expert also points to several aspects of the crossing that would have been distracting to drivers, which he claims contribute to the crossing's unsafe nature. For example, a stationary freight train was located approximately 1,000 feet to the west of the crossing. There was also a road running parallel to the tracks. Plaintiffs' expert states that these would have been distracting to a driver. He also contends that there was inadequate sight distance from the East 23rd Road to the track.

Finally, the parties dispute the effects of the actions taken by the train crew leading up to the collision. Plaintiffs argue that had the train not been speeding, or had the train crew applied the

brakes, the accident could have been avoided. Defendants respond that the fact that the train was exceeding the speed limit by 1 mph was not the cause of the accident, and that by the time it was apparent to the train crew that Rasmusen was not going to stop, no amount of braking would have prevented the accident.

Plaintiff Eric Rasmusen ("Plaintiff"), brought this action originally in the Circuit Court of the Thirteenth Judicial Circuit, LaSalle County, Illinois, but Defendant removed the case to this Court. Once in this Court, Plaintiff filed a First Amended Complaint acting as Executor of the Estate of Benjamin A. Rasmusen, Administrator of the Estate of Elizabeth G. Rasmusen, and father and next friend of Benjamin W. Rasmusen and Amelia Rasmusen. The Complaint asserts more than thirty causes of action against Defendants White, Schmitt, AMTRAK, BNSF and the First National Bank of Ottawa, Illinois, which was the Administrator of the Estate of Marilyn Rasmusen. While Plaintiff settled all of the claims against the Estate of Marilyn Rasmusen, his claims against the other Defendants remain. They include negligence, wrongful death and Illinois Family Expense Act claims asserted against each Defendant on behalf of each party represented by the named Plaintiff. The Defendants now move to bar two of Plaintiff's experts and for summary judgment in the case.

## II.  **ANALYSIS**

### A.  **Defendants' Motions to Bar Plaintiff's Experts**

The admissibility of expert testimony is governed by Federal Rules of Evidence 702 and 703, as well as the Supreme Court's opinion in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993).  *Nunez v. BNSF Ry. Co.*, No. 09-4037, 2012 U.S. Dist. LEXIS 97411 at *11 (C.D. Ill. July 13, 2012).  Whether to admit expert testimony rests within the discretion of the district court.  *Nunez,* 2012 U.S. Dist. LEXIS 97411 at *12.  A federal judge has the responsibility of being a "gatekeeper" regarding the expert evidence presented to the trier of fact.  *Daubert,* 509 U.S. at 589, 597 (1993).  A district court has "wide latitude in performing its gate keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable."  *Bielskis v. Louisville Ladder, Inc.,* 663 F.3d 887, 893 (7th Cir. 2011).

Rule 702 of the Federal Rules of Evidence establishes two general requirements regarding expert testimony:  "(1) the expert must be qualified, and (2) the subject matter of the expert's testimony must consist of specialized knowledge that will be helpful or essential to the trier of fact in deciding the case."  *United States v. Lanzotti,* 205 F.3d 951, 956 (7th Cir. 2000).  In determining the admissibility of expert testimony, a court must assess whether the testimony is rooted sufficiently in the facts of the case so that it will assist the jury in resolving a factual

dispute. *Daubert,* 509 U.S. at 591. "An analytical gap between the applicable facts and the proffered opinion cannot be bridged by the expert's *ipse dixit.*" *Chiriboga v. AMTRAK,* No. 08 C 7293, 2011 U.S. Dist. LEXIS 61857 at *18 (N.D. Ill. June 9, 2011). The party seeking to offer expert testimony has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence. *Dukes v. Illinois Cent. R.R.,* 934 F.Supp. 939, 946 (N.D. Ill. 1996).

### 1. *Motion to Bar Testimony of James Loumiet [ECF No. 58]*

Plaintiff's first expert is James Loumiet ("Loumiet"), an engineer with experience in train accident reconstruction, who plans to testify on several matters regarding the accident. Defendants seek to bar three of Loumiet's opinions:

1.  The East 23rd Road was extra hazardous and warranted lights or lights and gates.

2.  Reducing the speed of the Amtrak train might have given the Rasmusen car an extra .5 seconds to race in front of the train, with no ensuring collision; and

3.  If the train had been traveling 79 mph, rather than 81 mph, the car and train might not have arrived at the crossing at the same time, thereby avoiding the accident.

Defs.' Mot. to Bar Loumiet at 1, ECF No. 58. Defendants do not question Loumiet's qualifications. Instead, Defendants claim these opinions are based impermissibly on speculation or facts not in the record. The Court will examine each opinion in turn.

### a. *The Intersection was Extra Hazardous*

- 8 -

Loumiet concludes that the East 23rd Street crossing was extra hazardous before the time of the accident, and that the extra hazardous nature of the crossing was a "causative or contributory factor" in the collision. J. Loumiet Rep. at 5, Defs.' Mot. to Bar Loumiet Ex. A. He concludes it was extra hazardous because (1) unusually restricted sight distance; (2) high-speed passenger trains; (3) high train volumes; (4) use of crossing by large trucks and agricultural equipment; and (5) inadequate traffic control. *Id.*

Defendants take issue with Loumiet's conclusions, arguing that they are not consistent with the actual conditions of the crossing. Citing to cases such as *Tucker v. New York, C.& S.L.R. Co.*, 147 N.E.2d, 376, 378 (Ill. 1957), Defendants argue that Loumiet's testimony is irrelevant when contradicted by photographs they claim show that Rasmusen's view of the crossing was not obstructed. They also argue that Loumiet's opinions are based on conditions at the crossing that were not present at the time of the accident.

Plaintiff responds that Loumiet's conclusion - that the crossing was extra hazardous, and thus required the installation of automatic flashing lights - is based upon industry-accepted and peer-reviewed methodologies set forth by the Federal Highway Administration (the "FHWA") *Railroad-Highway Grade Crossing Handbook*. Plaintiff claims that Loumiet calculated sight distances according to the FHWA and American Association of State Highway and Transportation Officials methodologies, and considered various sight obstructions that made

the crossing extra hazardous.  Plaintiff also relies heavily on *Baker v. Canadian National/Illinois Central Railway Co.,* 397 F.Supp.2d 803 (S.D. Miss. 2005), in which a sister court denied a similar *Daubert* motion seeking to bar Loumiet from providing his opinion that a crossing was extra hazardous based on many of the same factors considered in his report for this matter.

For a jury to assess questions of whether a crossing is extra hazardous, Illinois courts consider a number of factors, including: obstructions to vision, volume and speed of vehicular traffic, track arrangement, intersecting driveways and roadways, angles at which roadways intersect the tracks, character of the highway, width of the crossing, track elevation, character of the surrounding area, and sight distance.  *Bassett v. Burlington Northern Railroad Company,* 476 N.E.2d 31, 34 (Ill. App. Ct. 1985).  Plaintiff, relying on *Baker,* claims that Loumiet's opinions should be admitted even if they are based on factors that did not cause the accident.  That, however, contradicts Illinois law.

In *Bassett v. Burlington Northern Railroad Company,* an Illinois appellate court reviewed a jury's consideration of whether a crossing was extra hazardous.  The Court explained:

> All railroad crossings present a danger to motorists, and not every additional peril will impose a greater duty on the railroad.  Each case must be decided independently by the jury, whose task it is to determine, from the circumstances in existence at the particular crossing *at the particular time the vehicle*

> *approaches*, whether the crossing is extra
> hazardous and the amount of protection required.

*Id.* (emphasis added). The court noted that expert witnesses called during the trial offered disparate opinions regarding the adequacy of the crossing signal in that case "under the conditions existing at the time of the accident," and that it was within the jury's province to accept or reject those opinions. *Id.; see also, Hunter v. Chicago & North Western Transp. Co.*, 558 N.E.2d 216, 221 (Ill. App. Ct. 1990). Thus, under Illinois law, the question of whether a crossing is extra hazardous depends on the conditions present at the time of the accident.

However, Loumiet concluded that there were sight obstructions present at the time of the accident that would have blocked Rasmusen's view of the approaching train. These include an evergreen tree 577 feet from the crossing, a second evergreen tree 1,006 feet from the crossing, and a third evergreen tree 1,117 feet from feet from the crossing. These facts appear to be corroborated by photographs as well as a reconstruction performed by BNSF. Loumiet concluded that Rasmusen's view of the train would have been obstructed when she was approximately 401 feet from the crossing, and again when she was 255 feet from the crossing. In addition, Loumiet identified other factors, such as limited sight distance, utility poles, the angle that East 23rd Road intersected the railway, multiple tracks, a parallel roadway and a stopped freight train just west of the crossing that were conditions present at the time of the

accident that could have contributed to making the crossing more dangerous.

Defendants try to downplay the trees identified by Loumiet by arguing that they "may have shielded the nose of the locomotive for perhaps a split second when the motorist was 401 feet (and 9 seconds) and 255 feet (and nearly 6 seconds) from the crossing. They certainly did not hide the other 892 feet of train." Defs.' Reply in Supp. of Mot. to Bar Loumiet at 6, ECF No. 73). Defendants fail to support this argument convincingly, however. While Defendants contest Loumiet's determination that the crossing angle is skewed to a degree that would make the crossing extra hazardous, they failed to address some of the other conditions Loumiet identified. These include the distractions he identified at the crossing like the stationary locomotive parked near the crossing. While Defendants argue that two series of photographs contradict Loumiet's conclusions, the Court does not find them so conclusive as to warrant barring Loumiet's testimony.

The Court concludes that Loumiet's expert testimony regarding the conditions present at the time of the accident is rooted sufficiently in the facts of the case and that it will assist the jury in resolving whether or not the crossing was extra hazardous. The Court will allow Loumiet to present his opinion regarding the conditions of the crossing at the time of the accident. However,

pursuant to Illinois law, Loumiet is barred from discussing any conditions that were not present at the time of the accident.

### b. Loumiet's Opinions Regarding Train Speed and Accident Avoidance

Defendants take issue with Loumiet's opinion that the collision could have been avoided if (a) the train had been traveling at the timetable speed limit of 79 mph as it approached the crossing; (b) the train brakes had been applied prior to impact; or (c) some combination of (a) or (b). Loumiet concluded that, assuming Rasmusen maintained a steady 30 mph speed up to the crossing, that she would have needed another .49 seconds to beat the train. He then explores a few means by which this half second could have been provided.

The parties agree that at the time of the accident, the train was moving at 81 mph. Plaintiffs contend that the train should have been moving at 79 mph, because that was the speed at which the train was supposed to be traveling according to the BNSF railway timetable. As such, Loumiet performed calculations that indicate the train would have arrived at the intersection a half second slower had it been moving at 79 mph. Such calculations must be excluded, however, as they ignore the relevant speed limit set by the federal government.

For a Class IV train such as the one at issue here, the Federal Railroad Administration ("FRA") sets the allowable speed limit at 80 mph. *See,* 49 C.F.R. § 213.9. Plaintiff does not dispute that the federally-imposed speed limit was 80 mph. Instead, Plaintiffs contend that despite the 80 mph speed limit set by the federal

government, Section 20106 permits a state tort action for a party's violation of, or failure to comply with, its own plan. This ignores the fact that federal law preempts the train's internal timetable.

The Court finds *St. Louis S.W. Ry. v. Pierce*, 68 F.3d 276 (8th Cir. 1995) instructive. In *Pierce*, a truck that became lodged at a railroad crossing was struck by a train. *Id.* at 277. The railroad company and conductor sued for damage caused by the train derailment, and won a jury verdict in the district court. *Id.* On appeal, the truck's owner argued that the train's speed of 49-50 mph was excessive. *Id.* at 278. *Id.* While the track where the accident occurred had a Federal Safety Act speed limit of 60 miles per hour, the railway had a self-imposed speed limit of 45 miles per hour. *Id.* The district court, relying on *CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658 (1993), concluded that the excessive speed claim was preempted and prevented the jury from considering any negligence based on the railway's violation of its own internal operating procedures involving speed limitations. *Pierce,* 68 F.3d at 278. The Eighth Circuit affirmed the district court's conclusion, based on *Easterwood* and a number of consistent opinions in other courts. *Id.* (collecting cases). This Court agrees that the federal speed limit of 80 mph preempts the railway's internal speed limit of 79 mph. This renders Loumiet's opinions and calculations based on a speed of 79 mph irrelevant, and as such, the Court bars them from consideration.

The opinion that speeding 1 mph over the 80 mph federal speed limit caused the accident fares no better.  It is undisputed that the train was traveling at 81 mph at the time of the collision.  But as Defendants point out, any testimony about the train traveling 1 mph over the speed limit is irrelevant without evidence that the deviation was a proximate cause of the accident.  *See, Gehl v. Soo Line R.R. Co.,* 967 F.2d 1204, 1207 (8th Cir. 1992) (no harm in excluding evidence of speed ordinance where plaintiff failed to prove excessive speed was proximate cause).  As discussed more thoroughly below in the context of Defendants' Summary Judgment Motion, Plaintiffs have failed to present evidence that the train's *de minimus* excessive speed was a proximate cause of the accident.  As such, Loumiet is barred from testifying that the train's excessive speed caused the collision.

For the reasons stated above, Defendants' Motion to Bar the Testimony of James Loumiet [ECF 58] is granted in part and denied in part.

### 2.  *Motion to Bar Testimony of Richard Beall [ECF No. 59]*

Defendants ask the Court to exclude several of the opinions put forth by Plaintiff's other expert, Richard Beall ("Beall").  As recognized by other courts in this District, Beall has a great deal of experience regarding train operations and safety procedures.  *See, e.g., Chiriboga*, 2011 U.S. Dist. LEXIS 61857 at *19.  As with Loumiet, Defendants do not challenge Beall's credentials, but instead

contend that his opinions lack factual support or are otherwise inappropriate.

In his report, Beall expresses a number of opinions regarding White and Schmitt's acts and omissions prior to the accident. Defendants seek to strike the following assertions made by Beall:

1.  That the engineer did not operate the train's horn in the proper manner, as he should have changed from the standard crossing pattern to a series of short sounds after spotting the Rasmusen car;

2.  That there was a "short horn" as the engineer did not sound the train horn for the entire 1/4 mile required by statute;

3.  That the engineer should have begun braking the train shortly after the train passed the whistle post due to the presence of the Rasmusen car (and that the assistant conductor should have hit the emergency brake when the engineer did not);

4.  That the engineer should have been traveling 79 mph, rather than 81 mph (and that the assistant engineer should have directed him to drop his speed;

5.  That the Amtrak engineer and assistant conductor were in violation of several of the General Code of Operating Rules (the "GCOR").

The Court will examine each opinion in turn.

### a.   Improper Horn Pattern

Beall's opinion regarding the manner in which the whistle was blown must be barred, as there is simply no support for it.  Beall claims that the engineer's

> use of the horn in a standard crossing signal
> pattern fashion is in violation of the

> procedures for proper operation of a train.  To
> continue sounding the horn in a standard
> sequencing is not good procedure for warning
> people on or around tracks.  Railroads recognize
> this and that is why there are rules written and
> in place for enhanced additional warning.  In my
> opinion the train's engineer, while recognizing
> this situation as emergent, exercised such poor
> judgment that he couldn't even follow the rules
> on emergency operation of the horn, let alone
> the train.  He should have not only sounded
> continuous short blasts of the whistle, but
> applied the brakes as well.

Beall Rep. at 8, Defs'. Mem. in Support of Summ. J. Ex. A.  Beall appears to have no basis for this statement, however, as the federal regulations governing train horns do not provide for such short blasts at crossings, and the internal regulation he cites as support has been superseded.

Congress enacted the Federal Rail Safety Act of 1970 (the "FRSA"), 49 U.S.C. §§ 20101 *et seq.*, to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents."  49 U.S.C. § 20101.  The FRSA empowers the Secretary of Transportation to "prescribe regulations and issue orders for every area of railroad safety."  *Burlington N. & Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 794 (7th Cir. 1999).  One such regulation states in part that:

> the locomotive horn on the lead locomotive of a
> train . . . shall be sounded when such
> locomotive . . . is approaching a public
> highway-rail grade crossing.  Sounding of the
> locomotive horn with two long blasts, one short
> blast and one long blast shall be initiated at a
> location . . . and shall be repeated or

> prolonged until the locomotive occupies the crossing.

49 C.F.R. § 222.21(a).

Plaintiff argues, however, that just because these regulations prescribe how a horn should be sounded when a train is approaching a crossing "does *not* prohibit the use of an alternate sequence in an emergency situation." Pl.'s Resp. to Mot. to Bar R. Beall at 7. Indeed, they argue that 49 C.F.R. § 222.23 sets forth the sounding of a horn during an emergency situation. As Plaintiff points out, § 222.23 states in part that "a locomotive engineer may sound the locomotive horn to provide a warning to animals, vehicle operators, pedestrians, trespassers or crews on other trains in an emergency situation if, in the locomotive engineer's sole judgment, such action is appropriate to prevent imminent injury, death or property damage." *Id.*

Plaintiff's reliance on this section is misplaced, however. First, the section says nothing about sounding the horn in short quick bursts in an emergency situation. It only states that an engineer may sound the horn to provide a warning if, in his sole judgment, such an action is appropriate. The testimony from White and Schmitt, as well as the event recorder, indicate that the horn was blowing leading up to the accident. Second, as Defendants point out, the Federal Railroad Administration explained expressly that § 222.23 "addresses the situations in which the locomotive horn may be sounded *within a quiet zone*." 70 F.R. 21844, 21858 (Apr. 27, 2005)

(emphasis added).  There is no evidence indicating that the crossing was in a quiet zone or that § 222.23 should apply.

Beall also supports his opinion with inapplicable internal rules.  According to Beall, Schmitt and White violated Rule 5.8.2 of the General Code of Operating Rules (the "GCOR") and Rule 1.9 of the "Amtrak Manual of Instruction for Transportation Department Employees" by not sounding the horn in short blasts.  The version of GCOR 5.8.2 cited by Beall stated "Sounding Whistle.  Succession of short sounds – Use when an emergency exists, or persons or livestock are on the track."  Beall Rep. at 11, Def.s' Mot. to Bar R. Beall Ex. A.  That version of the rule was from the 4th Edition, dated April 2, 2000.  It was revised in the 5th Edition, which was adopted in April 2005, to state that the use of the short horn blasts was for "when persons or livestock are on the track at *other than road crossings at grade.*"  Def.s' Mot. to Bar R. Beall Ex. H (emphasis added).  Thus, contrary to Beall's assertions, the rule was revised specifically to exclude railroad crossings from use of the short horn blasts in emergency situations.  Similarly problematic is his reliance on Rule 1.9 of the Manual of Instruction for Transportation Department Employees, as that manual was not in effect in 2009.

As Beall's opinion regarding the sounding of the horn is both contrary to federal regulations and based on outdated or inapplicable internal rules, it is without merit and thus barred.  *See, BNSF Ry. Co. v. Lafarge Southwest, Inc.*, No. 06-1076 MCA/LFG, 2009 U.S. Dist.

LEXIS 117408 at *17-18 (D. N.M. Feb. 15, 2009) (barring opinion that train horn should have been blown in short blasts due to such requirement being removed from BNSF rule years ago); *see also, Nunez v. BNSF Ry. Co.*, No. 09-4037, 2012 U.S. Dist. LEXIS 97411 at *16-20 (C.D. Ill. Jul. 13, 2012) (barring expert from testifying in part because opinion was based on outdated regulation).

### b. *"Short" Horn*

It is undisputed that the train's event recorder reflects that the engineer did not begin sounding the horn until the train was 1,166 feet from the crossing, rather than the required 1,320 feet. Defendants seek to limit Beall's opinion regarding the "short" horn, arguing that Beall "may try to testify that this 'short' horn constitutes negligence on the engineer's part." Defs.' Mot. to Bar R. Beall at 12. Plaintiff responds simply that proximate cause is a question of fact for the jury, and that sufficiency of a warning given by a train crew is a question of material fact that should be decided by a jury.

Plaintiff's response, however, really addresses only whether summary judgment should be granted on the issue, not whether the Court should bar Beall's opinion regarding the short horn. The problem facing the Court is that, having reviewed Beall's expert report, it cannot find any opinion regarding the short horn. *See,* Section VII of R. Beall Report at 8-9, Defs.' Mot. to Bar R. Beall Ex. A. Indeed, this is likely why Defendants seek to bar an opinion

that Beall "may" offer.  While it is clear that Beall is aware of the short horn, as he describes it in the "Accident Testimony and Investigation" portion of his report, he offers no discussion of it in his "Opinions" section.  *Id.* at 6, 8-9.

As the Seventh Circuit explained, "Rule 26(a) expert reports must be 'detailed and complete.'  A complete report must include the substance of the testimony which an expert is expected to give on direct examination together with the reasons therefore . . . Expert reports must not be sketchy, vague or preliminary in nature." *Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998).  "All opinions to be expressed must be contained in an expert report."  *Osterhouse v. Grover*, No. 3:04-cv-93-MJR, 2006 U.S. Dist. LEXIS 50282 at *7 (S.D. Ill. Jul. 20, 2006).

It is the Court's determination that Beall has offered no opinion regarding the short horn despite clearly being aware of the issue.  As such, he is barred from offering an opinion on the topic now.

### c. Braking

Defendants claim that Beall's opinions that the train crew should have gone to service breaking shortly after seeing Rasmusen's car are contrary to Illinois law, as the crew had no duty to do so. Plaintiff claims that Beall's opinion will assist the finder of fact, as the testimony supports the idea that such actions would have saved precious time and prevented the accident.

The Court finds that, based on Beall's expertise in train safety, as well as his application of that experience to the facts of this matter, that it would be appropriate to allow his opinion with respect to braking to be presented.

### d. Train Speed

For the reasons already described with respect to Loumiet's opinions regarding the train's speed, Beall's opinions with respect to the train exceeding the 79 mph internal limit or federally set 80 mph limit are barred.

### e. Violation of the General Code Operating Rules (GCOR)

Finally, Defendants take issue with Beall's opinion the conduct of Amtrak and its crew may have violated a number of General Code Operating Rules. While Defendants assert this objection with respect to a number of the rules identified by Beall, they are most concerned with his opinion that they may have violated GCOR 1.6, which provides that railroad employees must not be negligent. Defendants argue that it would be improper to allow Beall to offer testimony on the ultimate issue – whether or not Amtrak and its crew were negligent. Plaintiff responds that Beall has offered testimony regarding the reasonableness or unreasonableness of particular conduct by the crew, which it believes will assist the jury.

Both parties are right. It is clear that Beall cannot just state "Amtrak was negligent." *See, Andrews v. Metro-North Commuter R. Co.*, 882 F.2d 705, 708-09 (2nd Cir. 1989) (holding that trial

court erred in allowing opinion testimony that "the railroad was negligent"). By extension, it would be improper to allow him to opine that the train crew violated a GCOR that prohibited negligence, since that would amount to the same testimony.

Plaintiff, however, cites to *Dowe v. Amtrak*, No. 01 C 5808, 2004 U.S. Dist. LEXIS 7233 at *5-7 (N.D. Ill. Apr. 26, 2004), in which Amtrak sought to preclude Beall from testifying to the "reasonableness" or "prudence" of the conduct of another Amtrak engineer involved in a train collision, as well as characterizing the duty of care owed by Amtrak to the plaintiffs. *Id.* at *5-7. The court allowed Beall to present such testimony, so long as it was not conclusory. *Id.* at *6-7. "With explanation, testimony regarding the reasonableness or unreasonableness of particular conduct will assist the jury in understanding the evidence and determining facts in issue, and will not simply 'tell the jury what result to reach.'" *Id.* (quoting FED. R. EVID. 704, Advisory Comm. Notes).

As such, while Beall can opine, with explanation, about the reasonableness or unreasonableness of the train crew's actions, he is barred from presenting the opinion that Amtrak or its crew was negligent (or violated the prohibition in GCOR 1.6 from negligence).

For the reasons stated above, Defendants' Motion to Bar the Testimony of Richard Beall [ECF No. 59] is granted in part and denied in part.

**B. Motion for Summary Judgment [ECF No. 61]**

*1. Summary Judgment Legal Standard*

Federal Rule of Civil Procedure 56 requires this Court to enter summary judgment on the Defendants' motion "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). The court must review the record and draw all inferences from it in the light most favorable to the non-moving party. *Sharer v. Atchison, T.&S.F.R. Co.,* No. 91 C 3585, 1992 U.S. Dist. LEXIS 7224 at *14 (N.D. Ill. May 14, 1992).

*2. Local Rule 56.1*

When addressing summary judgment motions, the Court derives background facts from the parties' Local Rule 56.1 Statements, which assist the Court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposes to prove a disputed fact with admissible evidence." *Young v. Monahan*, No. 07 C 1193, 2009 U.S. Dist. LEXIS 78333 at *4 (N.D. Ill. Aug. 31, 2009) (quoting *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d

524, 527 (7th Cir. 2000)). Local Rule 56.1(a)(3) requires the moving party to provide a statement of material facts as to which the moving party contends there is no genuine issue. *Id.* The non-moving party must admit or deny each factual statement offered by the moving party and designate concisely any material facts that establish a genuine dispute for trial. *Id.* The Court may disregard statements and responses that do not cite to materials in the record. *Id.* at *6. In addition, a party may not satisfy its Rule 56.1 requirements with "evasive denials that do not fairly meet the substance of the material facts asserted." *Id.* (quoting *Bordelon,* 233 F.3d at 528).

Defendants argue that many of Plaintiff's responses to its Rule 56.1 Statement of Facts either deny the asserted facts without support, or add additional facts. In addition, Defendants claim that Plaintiff adds a number of facts in their response brief as well. The Court agrees that Plaintiff is guilty of the asserted problems to some degree, mostly in the form of adding unnecessary or irrelevant facts in their responses. Despite these shortcomings, the Court cannot say that Plaintiffs' transgressions were so widespread that it left the Court to play the role of a pig hunting for truffles when it came to searching for the facts of the case. *See, United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). The Court assures the parties that it reached its conclusions based on the record provided, but reminds them that the Local Rules are to be complied with strictly going forward.

### 3. *Analysis*

Plaintiff asserts a number of causes of action on behalf of the five Rasmusen family members involved in the accident. However, the Complaint contains only three types of claims: negligence, wrongful death and Family Expense Act, 750 Ill. Comp. Stat. 65/15. To prevail in a negligence claim, a plaintiff must "set forth sufficient facts to establish a duty owed by defendants to the plaintiff, a breach of that duty and an injury caused by the breach." *Weston v. Wal-Mart Stores, Inc.*, No. 07-CV-88-WDS, 2008 U.S. Dist. LEXIS 19375 at *2 (S.D. Ill. Mar. 10, 2008). "To prevail on their wrongful death claim, Plaintiffs must first prove that Defendants breached a duty to [plaintiff], and that this breach was the proximate cause of his death." *Estate of Mark Thrash v. Aldridge,* No. 01 C 9366, 2003 U.S. Dist. LEXIS 22769 at *16 (N.D. Ill. Dec. 18, 2003). Plaintiff asserts the Family Expense Act claims for medical expenses he incurred on behalf of his children as a result of the accident.

Defendants, in bringing their Motion for Summary Judgment, do not attempt to walk through specifically each count asserted by Plaintiff and explain what elements they contend lack an issue of material fact. Instead, the gist of their Summary Judgment Motion is simply that Defendants cannot be liable because Rasmusen was the sole cause, and entirely at fault, for the accident. They are arguing that they either owed Rasmusen no duty of care, or that any breach of the duty of care was not the proximate cause the accident. They do

so by arguing that the evidence shows: (1) that the railroad crossing was not extra hazardous; (2) no act or omission of the Amtrak Defendants caused the accident; and (3) Defendants were not in violation of an Illinois Commerce Commission order issued prior to the accident that required a stop sign be placed at the intersection. Having now ruled on Defendants' Daubert Motions regarding Loumiet and Beall, the Court will now turn to each of Defendants' contentions.

### a. Extra Hazardous Nature of the Crossing

A railroad has a common duty to provide adequate warning devices at its crossings. *Bassett,* 476 N.E.2d at 34. Questions such as whether a crossing is extra hazardous, and the amount of protection required at a railroad crossing, are usually reserved for the jury. *Sharer*, 1992 U.S. Dist. LEXIS 7224; *Bassett,* 476 N.E.2d at 34.

As explained earlier, whether a crossing is extra hazardous, and the amount of protection required at a crossing, must be decided "from the circumstances in existence at the particular crossing at the particular time the vehicle approaches." *Id.* Illinois courts have identified several factors to determine whether an extra hazardous condition exists at a crossing. *Id.* These factors include "physical obstructions to vision, volume and speed of vehicular and train traffic, track arrangement, intersecting driveways and roadways, angles at which roadways intersect the tracts, character of the highway, width of the crossing, track elevation, character of the surrounding neighborhood, and sight distance." *Id.* All of these

factors go toward the ultimate question of determining what precautions are necessary to enable a traveler to apprehend the approach of a train.  *Sharer*, 1992 U.S. Dist. LEXIS 7224 at *16.

The Court is satisfied, based on the expert testimony of Loumiet as well as some of the materials he relied upon in forming his opinion, that there is a material question of fact as to whether there were conditions present at the crossing at the time of the accident that could render the crossing extra hazardous.  The Court will thus leave it to a jury to determine whether the crossing was indeed extra hazardous at the time of the accident, and whether the warning devices present were appropriate for the intersection.

b.  *The Acts and Omissions of the Amtrak Defendants*

A railroad has a duty to exercise due care in order to avoid a collision.  *Espinoza v. Elgin, Joliet & E. Ry.*, 649 N.E.2d 1323, 1326 (Ill. 1995).  However, an engineer has a right, when he first sees a motorist, to act upon the presumption that the motorist will do what a reasonably prudent person would do and refrain from driving onto the track or putting himself in danger.  *Robertson v. New York C.R. Co.*, 58 N.E.2d 527, 529 (Ill. 1944).

> When a railroad train and a person traveling on a highway each approaches a railroad crossing at the same time, it is not the duty of the company to stop its train, but it is, instead, the duty of the traveler, in obedience to the known custom of the country, to stop and not pass in front of the advancing train.

*Id.*  An engineer is thus not required to stop his train "until it [becomes] apparent that the plaintiff had not heard or would not heed the signal."  *Id.*

Plaintiff claims that White and Schmitt were negligent in a number of different ways that led up to the accident.  Plaintiff claims that they operated the train at an excessive speed, failed to apply train brakes, and applied the horn incorrectly or not at all. Defendants argue that the facts show that none of these assertions is correct, and instead demonstrate that the Amtrak Defendants were not the proximate cause of the accident.  The Court will examine each in turn.

### i. *Defendants' Failure to Brake Prior to Impact*

It is undisputed that Defendants did not apply the train's brakes (either the emergency or service brakes) at any point prior to the collision with Rasmusen's car.  Failure to apply the brakes upon it becoming apparent that Rasmusen was not going to stop for the train is evidence from which a fact finder could conclude that Defendants breached their duty to Rasmusen.  Indeed, an engineer has a duty to try and stop the train when it becomes apparent that the plaintiff "had not heard or would not heed the signal."  *See, Robertson*, 58 N.E.2d at 584.

Defendants argue that any claim based on the failure to apply the brakes must fail, because by the time the engineer had any obligation to brake, no amount of braking have prevented the

- 29 -

collision.  Or, conversely, that at the time braking would have prevented the collision, Rasmusen's car was still at such a distance that the train crew had no duty to try and stop the train.

Despite arguing that his expert report should be barred in this action, Defendants rely heavily on the testimony and report of Plaintiff's expert Loumiet to support their argument.  Loumiet testified repeatedly that, assuming Rasmusen's car continued at 30 mph, that once the train was closer than 655 feet from the track (or approximately midway between the whistle pole and the intersection), no amount of braking would have avoided the collision.  *See, e.g.,* Loumiet Dep. at 176-77, Defs.' Mem. in Support of Summ. J. Ex. B. Defendants contend that the engineer would have had to make "a full-out emergency brake application when the train was still nearly 6 seconds from the crossing . . ." Defs.' Mem. in Supp. of Summ. J. at 10.  At that point, according to Loumiet, the car would be 243 feet away from impact.  Defendants also offer testimony from Loumiet that, depending on the perception reaction time of a driver, a car driving 30 mph on East 23rd Road could come to a stop in between 170-112 feet.  *See,* Defs.' L.R. 56.1 Statement of Facts ¶¶ 60-66.  They argue that since Rasmusen still could have stopped, it was not apparent to the crew that she was not going to, and thus, they had no duty to try and stop the train.

Plaintiff tries to address this argument in two ways.  First, Plaintiff argues, based entirely on case law from other

- 30 -

jurisdictions, that Rasmusen's unwavering approach to the tracks presented a "specific individual hazard." Pl.'s Opp. to Mot. for Summ. J. at 13. Plaintiff cites *Alcorn v. Union PC. R.R. Co.*, 50 S.W.3d 226 (Mo. 2001), in which the Missouri Supreme Court stated that:

> an unwavering approach by a vehicle at a railroad crossing, where the engineers knew or should have known that a collision was imminent, is a specific, identifiable hazard. Such a hazard requires the train's crew either to slow the train or stop, in addition to any other preventative measures it can take, to avoid the collision.

*Id.* at 242. Plaintiff argues that in this case, the train crew saw the Rasmusen vehicle approaching the tracks at approximately 30 mph with an unchanging speed, which should have alerted the crew that something was wrong and "created a duty on the part of the crew to stop or slow the train to avoid a specific, individual hazard." Pls.' Opp. to Mot. for Summ. J. at 14.

The Court fails to see how this "specific individual hazard" standard from other jurisdictions differs appreciably from the Illinois standard stated in *Robertson* that a conductor does not have a duty to stop the train until it becomes apparent that an oncoming driver is not going to stop. Both standards impose a duty upon the train crew to try to avoid a collision when it becomes apparent to them that such a collision is imminent. What Plaintiff fails to address is Defendants' contention that by the time it became apparent to the train crew that Rasmusen was not going to stop, (or that her

failure to slow down had made her a "specific individual hazard"), no amount of braking was going to stop the collision.

Plaintiff's expert, Loumiet, testified that to avoid an accident, the engineer would have had to make an emergency brake when it was at least 655 feet from the crossing (and the car was 243 feet from the crossing) to avoid the collision. Loumiet's own calculations indicate that the car could have stopped before the crossing had it began breaking 170-112 feet from the crossing. Plaintiff has produced no evidence indicating why the train crew should have thought that Rasmusen was not going to stop when she was 243 feet from the crossing. Indeed, Plaintiff put forth the testimony of Schmitt, who stated that when the train was 300 feet from the crossing (less than half the distance needed to stop the train to avoid the collision), he prayed that Rasmusen's car would stop. In other words, Schmitt still thought Rasmusen could stop when the train was well past the point of being able to stop before impact. White testified that it was not until a second or two before impact that stated to Schmitt that he thought he was going to hit Rasmusen. White Dep. at 97-98. This testimony, while not conclusive, indicates that it was not apparent to the train crew that Rasmusen was not going to stop until past the point that they could have stopped the train. Plaintiff provides no evidence to the contrary.

Plaintiff's second attempt to downplay Loumiet's calculations can be found in its Response to Defendant's Motion to Bar Richard Beall. There, Defendants again put forth the argument that Loumiet's calculations show that Rasmusen could have slowed and stopped easily prior to the crossing, which absolved the train crew of any obligation to apply the brakes. Plaintiff responds that "[t]his logic is flawed in that it assumes Mrs. Rasmusen was aware of the oncoming train when, in fact, she was not." Pl.'s Resp. to Mot. to Bar R. Beall at 5. However, the question is not what Rasmusen was or was not aware of, but what the *train crew* was or should have been aware of. Whether Rasmusen was aware of the train has nothing to do with the question of when it should have become apparent to the train crew that a driver is not heeding the warnings or stopping.

Finally, Plaintiff relies on the testimony of Beall, whose expert opinion was that "had engineer White gone immediately to service braking shortly after he first saw the vehicle, his train would have slowed sufficiently so as to have given Mrs. Rasmusen the few seconds needed to clear her vehicle from crossing." Beall Rep. at 8, Pl.'s Opp. to Summ. J. Ex. V. Setting aside for the moment the question of whether the train crew had any obligation to take such measures, Beall fails to provide any support for his contention that applying the service brakes would have actually provided Rasmusen enough time to beat the train. It appears that Beall did not perform calculations involving speed and distance. Instead, he speaks in

generalizations, saying that the service brakes should have been applied "shortly after" the crew saw Rasmusen's car, and that it would have given her "the few seconds" needed.  He did not state with any real specificity as the distance from the crossing the service brakes should have been applied, or how much time doing so would actually save.   While the Court does not dispute the idea that applying the service breaks would probably have slowed the train to some degree, Beall has provided no support or analysis to conclude what the degree would have been, or whether it would have ultimately prevented the accident.   His opinion is thus insufficient to create a genuine issue of material fact.

The Court thus finds that the train crew had a duty to apply the brakes once it became apparent that Rasmusen's car was not going to stop for the crossing, and the crew breached that duty by not applying the brakes at that time.   However, there is simply no evidence that had the train crew attempted to stop the train at the point when it became their duty to do so that the collision could have been avoided.   In situations where the evidence indicates that the train crew could not have prevented the accident after realizing that a vehicle is not going to yield to the train, summary judgment is warranted.   *See, e.g., Petre v. Norfolk S. Corp.,* 260 Fed.Appx. 756, 762 (6th Cir. 2007); *Byrne v. CSX Transp., Inc.,* No 3:09 cv 919, 2011 U.S. Dist. LEXIS 44903 at *14 (N.D. Ohio Apr. 26, 2011).   Thus, based on the record before the Court, the train crew's breach of that

duty of care cannot be the proximate cause of the accident.  Summary judgment must thus be granted as to those negligence claims based on the train crew's failure to brake or to keep an appropriate lookout.

### ii.  Excessive Train Speed

Related to the issue of braking is the fact that the train was traveling at an excessive speed.  It is undisputed that at the time of impact, and for some time prior to impact, the train was traveling at 81 mph.  As explained earlier, this is 1 mph over the limit set by the federal government under 49 C.F.R. § 213.9, and 2 mph above the limit set by the railway timetable.  Defendants argue that violating a speed limit does not render the excessive speed a proximate cause of the accident automatically.  Plaintiff contends that "[w]hether speed is a causative factor in this accident is better determined by the jury."  Pls.' Resp. to Def.'s Mot. to Bar J. Loumiet at 12.

Whether Plaintiffs argue that the train was traveling 1 mph or 2 mph over the limit does not matter, however, because there is no evidence that the excessive speed itself was a proximate cause of the accident.  As one court explained, "speed is not causal merely because the train arrived at the crossing the instant it did, while if it had been going slower, the [vehicle] might have safely crossed in front of it."  *Dombeck v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,* 129 N.W.2d 185, 192 (Wis. 1964); *see also, Hands v. Norfolk & W. Railway Co.,* No. 90-cv-70297-DT, 1991 U.S. Dist. LEXIS 8606 at *18-24 (E.D. Mi. Mar. 28, 1991); *Hale v. Cravens,* 263 N.E. 2d 593, 597 (Ill.

1970) (quoting *Jeneary v. Chicago & Interurban Traction Co.*, 138 N.E. 203 (Ill. 1923)).

In *Hotchkiss v. National Railroad Passenger Corporation*, the plaintiff contended at trial that excessive speed caused a train accident because had the train been traveling 8-10 mph slower 1,200 feet west of the crossing, it would have arrived at the intersection a second later than it actually did, allowing the vehicle it struck on the tracks to cross safely. *Hotchkiss v. National Railroad Passenger Corporation,* No. 88-1884, 1990 U.S. App. LEXIS 8694 at *22-23 (6th Cir. May 31, 1990). The court found that the evidence supporting that argument was insufficient to establish proximate cause. The court, quoting *Dombeck,* stated:

> [t]his court has never held that excessive or unlawful speed is causal merely because it places the vehicle at a particular place at a particular time. Excessive speed is causal, however, when it prevents or retards the operator, after seeing danger, from slowing down, stopping, or otherwise controlling the vehicle so as to avoid a collision.

*Id.* at *23 (quoting *Dombeck,* 129 N.W.2d at 192); *see also, Hands,* 1991 U.S. Dist. LEXIS 8606 at *23-25 (refusing to allow jury to speculate on whether speed was proximate cause of train/car accident and granting summary judgment).

The Court here has been presented with no evidence that the minimal amount of excess speed affected either Rasmusen or the train's decision-making. Indeed, the parties agree that Rasmusen would not have been able to tell the difference between a train

traveling at 81 mph and one traveling at 80 mph.  *See,* Defs.' L.R. 56.1 Statement of Facts. ¶ 58.  Nor does the evidence show that a difference of 1 (or even 2) mph would have affected the braking distance of the train significantly.  As such, Plaintiff's negligence claims based on excessive speed cannot survive.

### *iii.  Train Horn*

Plaintiff claims that the train crew failed to sound the horn, or that if they did sound the horn, they did not sound it properly. Defendants do not dispute that they had an obligation to sound the train horn as the train approaches, but argue that the evidence is clear that they sounded it in a manner consistent with federal regulations.

Defendants claim that the train's horn was working properly at the time of the accident, and that it was sounded prior to the collision with the Rasmusen car.  They rely on the testimony of both White and Schmitt, who claim the whistle was blowing and was as loud as it always was.  In further support of their assertion, it is undisputed that the train's event recorder reflects that the horn began sounding late, when the train was 150 feet past the whistle post (or 1,166 feet from the crossing).

Plaintiff, however, offers the affidavits of third parties Michael Fox and Miguel Vazquez Sr., who were both in the area of the accident yet did not recall hearing the train's horn prior to the collision.  Fox was repairing the roof of his barn approximately .8

miles from the accident. He did not see the accident, but heard a loud noise which he discovered was the collision. He did not hear a train horn prior to the crash. Vazquez, Sr. states that he was driving in his car eastbound on U.S. Highway 34 near the crossing when he witnessed the collision. He states that he saw the Rasmusen car when it was about 60 feet from the crossing and the train when it was about a quarter of a mile away from the crossing. He testified that at no time from the point he saw the train did it sound its horn. He was driving with his window down and without the radio on. Plaintiffs claim that this conflicting testimony creates an issue of fact.

The Court agrees. Taking the evidence in the light most favorable to the non-moving party, the Court finds that there is a genuine dispute as to whether the train horn was sounded, or sounded at the appropriate statutory interval so as to give Rasmusen adequate warning of the train's approach. Whether the horn was sounded at all, or sounded late, are questions of fact for the jury. As a sister court explained when faced with similar conflicting evidence, "[t]he issue of the train horn is merely a factual dispute between various eye witnesses and the mechanical event data recorder perfectly capable of being resolved by a properly instructed jury." *Brown v. Amtrak*, No. 3:08 cv 559KS-MTP, 2011 U.S. Dist. LEXIS 33216 at *31 (S.D. Miss. Mar. 28, 2011). Defendants' Motion is denied with respect to its claims regarding the sounding of the train's horn.

*c. Failure to Comply with the July 8, 2009*
*Illinois Commerce Commission Order*

As part of their claims against BNSF, Plaintiffs allege that BNSF failed negligently to provide a temporary stop sign prior to the accident pursuant to a July 8, 2009 Order issued by the Illinois Commerce Commission. Plaintiffs argue that any negligence claim based on this alleged failure to comply with the order must be dismissed based on the plain language of the order itself, which states:

> IT IS FURTHER ORDER that BNSF Railway Company shall, **within 30 days from the date of this Order,** install temporary STOP signs at the E.23rd Road grade crossing. The temporary STOP signs shall remain in place until the automatic warning devices authorized for installation by this Order are installed and operational.

Defs.' Mem in Support of Summ. J., Ex. A (emphasis added). Defendants argue that because this order provided for a temporary stop sign to be placed at the crossing within 30 days from July 8, 2009, they could not be in violation of the order because they had not yet erected the stop sign four days later when the accident occurred. The Court agrees. In addition, Plaintiffs fail to address this argument at all, so to the extent Plaintiffs asserted a negligence claim based on an alleged violation of the July 8, 2009 order, such a claim is dismissed. *See, Cent. States Se. and Sw. Areas Pension Fund v. Midwest Motor Express*, 181 F.3d 799, 808 (7th Cir. 1999) ("[A] district court need not scour the record to determine whether there exists a genuine issue of fact to preclude

summary judgment. Instead the court can rely upon the non-moving party to show such a dispute if one exists.").

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part.

### III.  <u>CONCLUSION</u>

For the reasons stated herein, the Court rules as follows:

1.    Defendants' Motion to Bar the Testimony of James Loumiet [ECF No. 58] is granted in part and denied in part;

2.    Defendant's Motion to Bar the Testimony of Richard Beall [ECF No. 59] is granted in part and denied in part; and

3.    Defendants' Motion for Summary Judgment [ECF No. 61] is granted on all issues except for the extra hazardous nature of the crossing and the failure to sound the train horn.

**IT IS SO ORDERED.**

_____
                    Harry D. Leinenweber, Judge
                    United States District Court

**DATE:** 9/12/2013